Good morning. May it please the Court. I'm Will Plannert of Troutman Sanders, here on behalf of the Appellant ASI. In its action before the Court of International Trade, ASI challenges under the APA the lawfulness of liquidation instructions, amended liquidation instructions, issued by the U.S. Department of Commerce in connection with an anti-dumping duty administrative review. So what's unlawful about them? What's unlawful about them, Your Honor, is the liquidation instructions instruct the Customs Service to assess ASI's particular entries at an assessment rate, an ad valorem rate of duties that is different from the assessment rate that was determined in the underlying administrative review. What's wrong with that? If it's the correction of an error, what's wrong with that? Well, what's wrong with it is that the error, if there is one, and we agree there was a mistake made, is an error in the review, the administrative review. It is not an error in liquidation instructions. There's nothing wrong with correcting errors in liquidation instructions. Well, suppose it is an error in the administrative review. Why can't they correct it? The reason they can't correct them, Your Honor, is because the anti-dumping statute requires that the liquidation instructions must implement the results of the review. This Court has in a number of cases addressed this precise question. No, no, but if they correct the original administrative review, then the liquidation instructions will be implemented. What I'm asking you is, under 1675H, why can't Commerce correct the original determination and correct the error? Well, Your Honor, they might be able to, and that's a very good, and that's a possibility that the Court of International Trade has recognized. The problem is that that question is not before this Court, or before the Court of International Trade. Well, why not? I mean, it has to do with your probability of success on the merits. Why, if there is an error, can't they correct it under 1675H? And why doesn't that mean that you're not likely to succeed? Well, Your Honor, again, the first problem is because the Commerce Department expressly disclaims that it's acting under 1675H. It expressly denies that it is correcting a ministerial error in the determination, and it denies that there is an error in the determination. What was the error in the second final result? The error was that there— In the results themselves? In the results themselves. In the results themselves, the Commerce Department essentially calculates a couple of different dumping margins. It calculates— Let me just back up. In the first amended final result, right? Yes. There was an error, right? A ministerial error, and that error was with regard to the DARE group calculation, right? Well, they were— That's correct. Yes, there have been a number of ministerial errors. So what I can't get at is what the error here, which seems to be a mistake made in the instructions from Commerce to Customs on what rate to do a liquidation, I'm having trouble understanding why that is a ministerial error in the final determination. And the reason for that is because the instructions simply tell Customs, here's the rate. The original instructions, let's start with those, in July, specified a specific rate for ASI's entries. But the rate that's going to be computed for your client, which is going to go down in the secret instructions from Commerce to Customs on what rate to be charged, that's calculated outside of the reference of the underlying proceedings. No, Your Honor, it's not. It's not? No, that's the very important point. And if you look in the appendix, you can see at page—I apologize, the copying is a little different, but it's page 200248. There is a page. This is a printout of— 200248? Yes, I'm sorry, 248. This is a printout of the computer program output for the dumping margin calculation in the review results. The date on that, you can see it's April 1 of 2009. So this is the second amendment final results. And in that calculation, under the column in the second row called percent ad valorem assessment, there is a rate there for ASI. Percent ad valorem, yeah, okay. That is precisely the rate that in July, after the review results were final— Which one is the ASI rate? I'm sorry, it's under the column observation one. One is one. I got it. If you read across— I got it. Okay. That is precisely the rate that the Commerce Department instructed Customs and Border Protection to assess on entry. So the liquidation— I don't understand it. Why isn't this done in connection with the basic determination of the liquidation rate for you? You're telling me that this is actually part of the underlying review? Absolutely, Your Honor. How do I know that? You know that for a couple of reasons. First of all, you know it because it's part of a single integrated dumping margin calculation program. This rate is calculated precisely at the same time and in the same program as the rate published in the Federal Register. The other way you know it is the Federal Register notice itself— It's published for—this is not published. This number is not published, but that's my second point. So this is part of how they can't get to an instruction without this, right? Absolutely. And so this is being done as part of the process of ginning up a liquidation number, right? Well, no, Your Honor, I don't agree with that. I mean, it's part of the process of doing what the statute directs Commerce to do, which is to determine the dumping margin to be assessed on each entry being reviewed. And this is the only place that you get a dumping margin to be assessed on entries. The overall rate published in the Federal Register is an overall weighted average margin for all of the exporters' sales. But what happens, as I understand it, following up on what Judge Clevenger is asking about, is that the calculation error of April 1st was made a couple of days after the publication of the final results, correct? No, Your Honor. No? The calculation error happened before publication. Well, yes, but this April 1st document that you're showing us was prepared a couple of days after the publication of the final results. No, Your Honor, it was not. No? Why is that wrong? Well, it's wrong, first of all, because the dates are wrong. The final results were published March 22nd. Second Amendment final results, March 27th, in the Federal Register. In other words, this document did not exist at the time the final results were published, correct? No, that's not correct. How do we know that? Well, we know that because, first of all, the Commerce Department couldn't have published final results without having this document. This document is part of a lengthy printout that includes all of the calculations. The Commerce Department could not have known what number to publish in the Federal Register if this document did not exist. Now, the reason that it's dated when it is, this may be the case that this particular printout was printed later. I can't answer that without looking into it further. But I think it's very clear, and I don't think the government will disagree with this, that this document would have existed if it was part of one program. In fact, the government concedes at page, I believe it's five of its brief, that there's a single integrated. Well, it's important for you to make the point, isn't it, because if this document is not part of the final determination, then you're outside of H altogether. My understanding from the government was they're trying to say this is not a Section 8 case. Maybe I missed what they're trying to say, but they're saying all they're doing is correcting errors in instructions. That is exactly what they're saying, Your Honor, and that's why. Right. So they're saying, for example, if the first set of instructions to customs had perhaps just inverted, given your client not a different rate, but a rate assigned to some other importer, that would be a mistake in the instructions. They could correct it, right? Absolutely. That's something that could be corrected. And that would have nothing to do with the final determination. I agree. Absolutely. And in fact, there is a case where that's correct. So why does the arithmetic computation after the final results are public, the Second Amendment final results are public, why does a commerce arithmetic computation become an error in the final determination as opposed to an error in calculating the instructions to customs? Again, Your Honor, I mean, the fact is that this was not a calculation done after publication, and I apologize for the confusion. What you're saying is that these calculations underlay the final results, right? Precisely. They were not, however, published as part of the final results in the Federal Register. That's correct. And so the question is when they talk about errors in the final determination, whether they're talking about just errors in the published information or whether they are also talking about information underlying that information. Right. And the reason, one of the reasons why we know that it cannot be the case, as the government contends, that this calculation is not part of the final determination is this. There have been cases, several of them, including actually the first review of this very case, where parties, upon getting disclosure of how this number assessment was calculated, have appealed in the appeal of the final determination under 1581C, have challenged the methodology used to compute particular assessment rates. The CIT has never suggested, no party has ever suggested, that that issue can't be reviewed because it's not part of the final review results. And again, under C, the Court has jurisdiction only of appeals of particular enumerated determination. What are the cases where they've made that determination of assessment rates in reviewing the final determination? Well, one of the leading cases, Your Honor, is a case called Hynek Semiconductor versus the United States, and that's 414F sub 1317. And that's a very helpful case, actually, because in that case we had exactly the problem that's posited here. In that case, the Commerce Department assessment calculations But you don't have any authority from this Court. I'm sorry. You're citing the CIT case. No, because I don't think anybody has ever previously suggested that the assessment rate calculation couldn't be part of the results. But the reason why this case is helpful is because in that case, exactly the hypothetical you posed happened. The mistake was not in the assessment rates, which were calculated correctly in the results. The mistake was made when the person at the Commerce Department who prepared the liquidation instructions copied the wrong number out of the printout. And instead of calculating the assessment rate that was intended, the person actually copied out of the printout the published number. And in that case, the question before the Court of International Trade was, is this a mistake of fact that can be corrected under 1520? In order to do that, the Court had to go through an extensive analysis of, okay, what are these instructions? Is this really a substantive determination being made here, or is this simply essentially a ministerial act? And what the Court concluded was that the relevant legal determinations were made in the review results. Well, if we were to disagree with you and decide under the regulations that this particular error was not one that was committed in the underlying proceedings but was simply an error in calculating the instructions for liquidation, then you're out of luck, right? Your Honor, that's correct. However, if you were to conclude that, you would also then create the perverse result, I think, that no party that wanted to challenge assessment rates could ever do so without just bringing an APA case under 1581I because you would be holding that the Commerce Department's calculations... Well, what's wrong with that? Well, what's wrong... You're not saying that it would take relief away from you? Well, what's wrong with that is... It seems to me that there's a fundamental difference here. If you look at the Second Amendment final results, you'll see where they're talking about ministerial errors. They're talking about that 39.46 calculation for the dairy group, and that's clearly no argument about that being in the guts of the second final determination, right? Yeah, that's right. But when you get down to somebody who's in commerce, when the main proceedings are over, the numbers have been ginned up to then allow the numbers crunchers to send out individual little notices about each individual importer. Why aren't you into the territory of ministerial change in the instructions to customers? Because the ginning up of those numbers happens in the determination, and one way you can see that is if you look in that notice, the Commerce Department states under assessment... Which notice are we talking about? This is the Second Amendment final results. Which page? Page JA200216. Yep. Which column? The Department will determine Customs Border Collection... Which column? I'm sorry, first column near the bottom where it says assessment rate. On page 216? Yes. The first column. Yes, it's at the very bottom of the first column. We'll determine, okay. And Customs Border will assess duties on all appropriate entries based on the amended final results. And then it says for details on the assessment, see the final results. So that refers us back to the original final review results. And if we look at the original final review results, which appear in the appendix at page 200232. 200232? Yes, Your Honor. That's where it starts. I get it. On the next page, 237, you have a similar paragraph beginning in the first column that deals with assessment rates. And it starts out with very similar language to what I just quoted. And then about a third of the way down the page, there is a sentence that begins, For customers slash importers of the respondents that have reported entered value, we have calculated, not we will calculate, we have calculated customer-specific anti-dumping duty assessment amounts. I'm sorry. Customer assessment amounts based on customer slash importer-specific ad valorem rates in accordance with section 2. And you're representing to us that at page 248, 200248, the document you talked about earlier, this 801 document, that is that specific calculation? Right. It would have been the previous version of this. I understand. What we see there on the April 1 document is the kind of document to which reference is being made as being done under 351212. Precisely. And so what the Commerce Department is saying here is as part of our determination, we've determined these rates, we're not publishing them, but they are disclosed to the parties under protective order. Okay. Suppose hypothetically you're right about that. Why can't Commerce correct an error in the assessment rate if it does so in a reasonable time under 1675A? Well, it could certainly do so if it were under reasonable time. The question that would then be presented- But what's their contention? Well, our contention in a nutshell is that- Wait, wait, wait. Okay, I'm sorry. What's their contention as to why they can't proceed to correct the assessment rate, assuming that they are in the final result? Okay. Well, first of all, they would have to be honest about doing that, and I've made that point. But should the Commerce Department say, we are going to correct assessment results, the problem we would have with that is, is that a reasonable time? And we would suggest that reasonable time cannot extend to a point beyond which the review results have been completed and judicial review thereof has been completed. And the reason for that, among others, is this. Ministerial errors, while they're different in some ways from legal errors, they're still errors in review results. And if you want to challenge them, you can raise them before Commerce, but if the Commerce Department doesn't get you the relief that you seek, or even in some cases if you don't avail yourself of the opportunity to challenge them before Commerce, you can challenge them at the Court of International Trade in an action filed under C. Why wasn't the action taken by the government here in a reasonable time in the setting of this case? Well, it still hasn't been taken, Your Honor. That's the first point. I mean, the Commerce Department, whatever else has gone on here, the Commerce Department has not. Well, I mean, they're attempting. It would have all been done before the lawsuit. They're really not attempting. I think what the government is really attempting to do here is evade the very question you asked. Is this within a reasonable time? What they have tried to do. Could you just take chronologically what happened? Yeah. How long after the publication of the Second Amendment results, it took, what, a month or so, when the domestic group came to Commerce and said, hey, there's a mistake here? Well, it took a month. So from the time that the mistake was found. Well, from the time the mistake was found, I believe, by the domestic parties for the first time in August, which is a number of months after that. And the reason they found them was because that's when they saw the liquidation instructions. However, the liquidation instructions, this is very important, didn't tell them anything that they didn't already know about what the assessment rates were going to be. That was disclosed in the Second Amendment final results. And indeed, the same error, although the numbers were different, happened in the preliminary review results back in February of 2008. It happened in the first final results. It happened in the First Amendment final results. You say it's not a reasonable time because the time for review of the final order had expired. Yes. But I don't understand the government to be contending that there isn't a review proceeding available if the error correction is itself erroneous. Well, what I mean by that is this. Am I not correct about that? That they concede that if the error correction is erroneous, you can challenge that, right? And they're not taking away your right to challenge it. No, no, no, and that wasn't my point. But what they would be doing is essentially allowing an end run around the deadline for filing an appeal in the first place. Remember, this is an error. But what's the prejudice? Well, the prejudice, Your Honor, is the statute gives 30 days after final review results are published within which to initiate an appeal at the Court of International Trade. You have to raise whatever issues you want to challenge. But the government says if we made a mistake in correcting the error, you can challenge it later. They're not trying to cut you off. I'm not suggesting they're trying to cut me off. What I'm suggesting is they would effectively be giving the domestic industry the opportunity to raise an issue that should have been raised in its original appeal of the original results because the error was present in those results and would be allowing them to get relief long after the deadline had expired for them to have filed a complaint. The deadline in the regulations, you mean? I'm talking about the deadline in the statute that gives you 30 days within which to initiate a challenge of final review results. Mr. Planner, I think we've gone well past our time. I'll give you two minutes of rebuttal time. If you'll add five minutes to – well, the trouble is who do I add it to? I'm going to give it to Mr. Ticini, and if he wants to quit a little earlier, he will have that option. Thank you, Mr. Planner. Thank you. So you'll have 15, and Mr. Dorn will have five unless you are willing to give him some share of the extra time. I'll give him one minute of the extra time, Your Honor. Can you focus on – as I understood your brief, your take on this case was the only mistake here was in the instructions that were given to customs to gin up numbers on specific imports, and your argument was this wasn't an error that was in the Second Amendment final determination. And that's true, and in fact – How do you maintain that argument in the light of the piece of paper we see at JA20048, and we see the language that was pointed to us in the First Amendment case that describes what this is all about? Well, if you go – if you go look at the – Can you just be very specific? Yes, if you – This piece of paper that has got the 2.91 number on it, the fatal number, right? That's at page 248, 200248. 200248. Yes, that's correct. Okay. I thought you had that marked. See the 291 there? Yes, I see that. Yeah, that's the big mistake, right? That's correct. That's the big mistake. Now, that number, okay, according to what your folks told us in the Federal Register, that is a calculated customer-specific annual duty assessment, at the rate computed in accordance with 351.212.B1, correct? Well, it was not calculated in accordance with 351.212, and that's where the Department of Commerce departed from its last practice. Commerce didn't follow its own instructions? That's correct. And Commerce noted its error because it did not follow its past practice. When was this piece of paper at 248? Why was that created? It's created by Commerce, right? That's correct. That's a printout from the Department of Commerce's SAS database where it kicks. And that is, if you look at what you said, that is a calculated customer-specific annual duty assessment, right? That's correct. And I thought that at A237, JET 200237, this was in your first, I guess in your original dumping order, you're explaining that that's a calculation that takes place during the underlying proceeding. That's a calculation that occurs at the same time as the underlying proceeding. And if you also look at the middle of the paragraph on the left of page 237 there. The middle of the paragraph on the left? Yes, of page 200237 of the FR notice. Yes. Commerce states, We have calculated customer-specific anti-dumping duty assessment amounts based on customer importer-specific ad valorem rates in accordance with 19 CFR 212B1. Right. However, the Department of Commerce, in fact, did not do that because the Department of Commerce erroneously failed to follow its regulation in this case. But they purported to calculate a rate, an assessment rate. It happened to be wrong, but they calculated a rate, right? That's correct. However, they calculated the denominator. Were they using the mechanism? I don't have 351.212 in front of me. Were they using the mechanisms of that and just misused them? That's correct. They added an extra term in the denominator so that the rate was reduced by approximately a factor. And they made the mistake in the 251 calculation? That's correct. And that was clearly done in connection with the underlying first or second amended order, right? That's correct. In 212B1, it states, The secretary normally will calculate the assessment rate by dividing the dumping margin found on the subject merchandise examined by entered value of searched merchandise for normal customs duty purposes. This being the case, how can the government unblushingly assert that this is what's going on here is not trying to correct an error that happened in the underlying proceedings? Because it occurred at the same time as the underlying proceedings, but the final results themselves were unchanged in Commerce's determination. It wasn't published in the Federal Register. It was basically your contention, right? That's true. So it's not in the final determination if it's not published in the Federal Register, even though it's an underlying calculation. That's your theory. No, that's not our theory. It's not your theory? Because a number of things also don't get published in the Federal Register or in the decision memo, and those things still would be subsumed within the final results. However, in this case, the final results... What's the difference between those and this one? Well, this one is different because the Department of Commerce purported to have done one thing in the final results, in the FR notice. However, the actual liquidation instructions were inconsistent with what the Department of Commerce purported to have done, and under that scenario... I don't understand what you're saying. The first set of instructions to customs were entirely consistent with everything that had been done by Commerce, right? It was a number that was calculated based off of this 291 number, the amount of money that the importer is going to have to cost up. Well, that's actually, if you look at page 248, it highlights the error because in the row, in the observation one row, where the percent ad valorem assessment rate appears, there's also another column, anti-dumping duties due, and there's a number, and that number is actually the correct number. So that's the amount of duties that should be owed. However, applying the rate found in the fourth column, you're not going to get to that rate of duty. I don't understand. I mean, there's a mistake in the underlying calculations. You agreed that other underlying calculations are part of the final results, even though they're not published in the Federal Register. So why aren't these assessment calculations made as part of the underlying thing in the final results, in the final results? Well, because the Department of Commerce was construing the scope of its own regulation and also construing the scope of exactly what's in the final results in light of precedent of this Court, including Chenier, consolidated bearings, this Court's previous ASI decision, which is an unpublished decision, although it involved issues very, very similar to this case. And the Department of Commerce concluded that because it stated in its FR notice that it had followed its regulation, it construed liquidation instructions that were issued that did not comport with the regulation as inconsistent with its past policy, and therefore... In reviews of final determinations, is opposing counsel right that there have been challenges to assessment rates as part of those challenges to the final results in the Court of International Trade? Usually there are not. Usually there are challenges... No, no, no. I don't care about usually. Does it happen that people challenge assessment rates as part of a challenge to the final results? I'm unaware of any cases where a party challenged a pure assessment rate without challenging some other aspect of the dumping margin for the export. But have they challenged assessment rates in challenging the final results? I'm unaware of any cases that involve that situation. What is Commerce's position as to whether if there is a challenge to the assessment rate that it has to be brought as part of a challenge to the final results? Is your view that it does have to be brought as part of a challenge to the final results? Well, it used to be our view, but before cases such as Chenier and consolidated bearings in the previous ASI case came to light, the Department of Commerce has been working very diligently to comply with this Court's precedent along those lines and draw that line between what is part of the final results issued under such consistency. So where are you drawing that line now? If somebody wants to challenge an assessment rate, forget about the error issue here. Someone wants to challenge an assessment rate. Can they do it as part of the final results? Do they have to do it as part of the results, final results challenge, or can they do it later? They can. We believe that they can, depending on how the assessment rate was calculated, they can either, if they're challenging the actual exporter's dumping margin that went into the final results, then they have to bring a C action. If they're challenging some sort of error in calculation of the assessment rate itself, then under this Court's precedent, it really depends on whether the assessment rate is consistent with the exporter's dumping margin that went into the calculation. But if they argue that it's not consistent, they can challenge as part of the C challenge? If it's not consistent, well, that issue has not really presented itself because if someone's going to bring a C challenge, they have 30 days to do it. And if they bring a timely C challenge because the statute of limitations for an I case is two years, that sort of issue never has come up. But, I mean, I think the point that Judge Dyke was asking was if one wants to challenge the final results, let's assume it's not a First Amendment, just the final results, in connection with that challenge, can the person who's aggrieved of the assessment rate that's been assigned to them in this little piece of paper we're seeing, can they bring that as part of a challenge in the final results? In theory, yes, they can. And there would be no objection to it being brought at that time. Right. Well, you would object, I'm certain you would object, if that assessment rate had no relationship to the underlying proceeding. I think the reason why Judge Dyke was asking the question, the reason why I want to have the question answered, is that if the assessment rate is challengeable in a challenge to the final results, then it has to be something that emanates from the final results. Otherwise, the court would have no jurisdiction over that sub-issue. I mean, you can't challenge, you know, the weather report. You want to disagree with that in the challenge to the underlying proceeding. You've got to have something that's connected up and tied to it. That's correct. And so the question here is whether the Department of Commerce, how does it draw the line between the final results and the administration and enforcement of those final results, the former being reviewable exclusively under C and the latter being reviewable under I? And because of basic practicalities, if someone challenges administration and enforcement under C, there's probably not going to be much objection, and that issue will be dealt with because there's 30 days to bring a C action. So it's doubtful that the case would be dismissed. Well, the regulations that you promulgated under the statute that's at issue here, right? This is 351.224? That's correct. And those were it, right? It's talking about the secretary of the disclosed to a party, and the proceedings calculation performed of any in connection with a preliminary or a final determination. Are the calculations here, this assessment calculation, is that a calculation that's made in connection with the final determination? Yes. What would be the implication of resolving this case under 1675H and just construing your actions as within a reasonable time? Another way of asking the question, why do you disclaim that you are acting under 1675H? Well, for a couple reasons, and we actually agree with ASI to some extent on this issue. Under section 1675H, the Department of Commerce may amend its final results within a reasonable period of time. Why wouldn't you just say, great, let's do that? Well, because there's a 30-day deadline to initiate judicial review. Also, there's a statutory mandate that all subject entries, to the extent practical, be liquidated within 90 days after publication of final results. You're looking for a bright line rule, aren't you, that says that when you're talking about something that can be fairly characterized as Commerce's instructions to customs on exactly how to implement the underlying matter, that those things are on one side of the fence in terms of your authority to correct them. You can correct them any time before liquidation in your review, right? Correct. And you want that bright line drawn as a matter of administrative convenience so that you know that once the final determination is published, if the error is a matter like the DARE group issue was, well, then that's got to be cured and dealt with under H, because that's clearly inside the proceeding, right? Correct. And so what you're saying is whether you would like to read your, that's why I asked you this business about any connection with, and you answered it wrong, to support your point, because you ought to be saying, you know, that the connections in connection with a preliminary determination or final determination, those calculations are things like the DARE group number, not these numbers. But we believe that if so long as a calculation is, so long as a calculation of an importer-specific assessment rate, I think what you're saying is that everybody, and I think even your adversary, would agree that if what you were trying to correct in terms of instructions down to customs that emanate out of commerce, if, for example, they just had flipped the names instead of having an error in the underlying number, and ASI had gotten a rate that belonged to the Clevenger importing company, that that is just a little error in the instructions. That can be cured wholly without regard to subject with H. Everybody would agree with that. That's correct. And what you're trying to say is, well, why not have the same rule when the mistake was an arithmetic mistake as to what a rate was? And that's exactly. But your problem is that that arithmetic mistake as to this importer-specific rate finds its origin in the underlying proceeding. That's true. And, in fact, ASI's last case was exactly the same situation where the court concluded that there was jurisdiction on the plot. So let's assume that it was an error in the final results. Is your position that you can correct it under 1675H because it was corrected in a reasonable time? No. No? No. You lose. In other words, you agree that you lose if we find this is an error in the final results. We agree. We agree we lose if it's an error in the final results and we win. Why in heaven's name would you agree to that? I mean, the statute says you have authority to correct in a reasonable time. Why are you saying that you didn't do that? Because we are more concerned with having a bright-line rule, having administrative certainty not only for the government but for exporters and importers and the domestic industry as well. Thank you. Thank you. Mr. Dorn, you have five minutes. May I please report? Do you agree with the government's last statement? No, Your Honor. Definitely not. I didn't think so. But the court does not need to get there. Well, assume, why don't we assume that we decide that this indeed is an instance in which the error that was being corrected was an error that was in the underlying proceeding. Because the court should look at the issue that's here. We're not here to judge Mr. Dorn. We're here to judge the September 17 decision. But Judge Clevenger is asking, let's suppose it is an error in the final result. We reject the government's position on that. Tell us why it can be corrected under 1675H because that is apparently your view. Well, I don't think you need to get to 1675H. No, but stay there. Well, this court has never. Let's assume you lose on the other thing and that we hold that the government has to proceed under 1675H. Is this done within a reasonable time under 1675H? Yes, Your Honor. Well, explain why. Because as the petitioners, we were diligent in obtaining copies of the liquidation instructions. We kept asking, asking, asking. We finally got a copy. As soon as we saw them, the next day we called the Department of Commerce, pointed out the error. The Commerce Department says, well, let's put everybody on notice. So we put something in writing. And then they promptly corrected it. So it's inconceivable to me how that was not done within a reasonable period of time. And there's never been a case that I'm aware of where the Federal Circuit has prevented the Department of Commerce from correcting a clerical error in order to achieve an accurate margin of dumping. And as Judge Rastani said, in the Arabian case— But he just told us the deadline is more important than the correct number. Well, I don't see anything in the statute that says that, Your Honor. There's certainly nothing in the case law that says that. What I would like to focus on is something that— Well, but he's saying, yes, there is something in the statute that says that. The 30-day limit and the time limits are there, and they are to be honored and must be honored. And therefore, he is willing to say— They're willing to lose the case to win the proposition they want. You don't want to see the case lost. Let me turn to the statutory provisions that underpin the September 17 decision memorandum of the Department of Commerce. That's what the Court should focus on. And that's what we've had no discussion about today. I mean, it's our position that the plain meaning of the statute, 1675A2C, required Commerce to correct that flawed computer error-generated instruction because it's not based on the dumping margin of the DARE group. And I would ask you to look at the language of 1675A2. That paragraph describes the determination the Department of Commerce makes in an administrative review. And that determination is to calculate a dumping margin in normal value and export prices. If you look at the definition of dumping margin in 167734, it's described as the difference between the exporter's normal value and its export price in the United States. ASI does not have a dumping margin. ASI does not have an export price within the meaning of 1677A. It cannot have a normal value within the meaning of 1677B. The only dumping margin that was determined here that's relevant is the dumping margin for the DARE group, the exporter that supplied ASI. And if you look at the final results at 216 of the appendix, the Department of Commerce said listed below are the revised weighted average dumping margins resulting from these amended final results. And there's a margin for the DARE group. And then it says the Department will determine and Customs and Border Protection shall assess any dumping duties on all appropriate entries based on the second amended final results. The second amended final results are the dumping margins that are calculated. If you look at 1675A2, there's no reference to importer-specific assessment rates. All the focus is on dumping margins. So in our view, Commerce is compelled. As Commerce itself said in the September 17 memos, it said it was required to correct the error in order to faithfully implement the second review results under 1675A2C. Because that's the only way it could implement the dumping margin. So the computer program, just to make one point, the computer program that was referred to earlier, that's not the underpinning of the final results. That final calculation is made in order to allow Commerce to administer and enforce DARE's dumping margin as a specific importer's. Thank you. Thank you, Mr. Dorn. Mr. Planner, you have two minutes. Thank you. I would just like to come back very quickly to this question of 1675H. When I have time, I'll address Mr. Dorn's statutory argument. The important point about 1675H is to the extent that the Commerce Department has the ability to do that, to amend the review results, it can do it at any time. Nothing in this court appeal turns on that. Our success on the merits that we have to establish is that the liquidation instructions that we are challenging in this APA action are unlawful, and I believe we have done that by demonstrating that they are not consistent with the review results, which I believe the government has conceded include the calculations underpinning those review results. This court really cannot affirm the government, nor can the Court of International Trade, on a theory that the government itself disclaims. That would be a violation of the Chenery Doctrine. The Commerce Department, for better or for worse, has said this is only a correction to liquidation instructions. This is not a change in review results, and as Mr. Tosini conceded, if the Court disagrees with that, then they have to lose in this case. Turning quickly to Mr. Dorn's statutory argument, the problem with his argument is that what the statute directs the Commerce Department to is determine a dumping margin on each such entry, that is, each entry covered by the review. Exporters don't have entries here. Importers have entries, and therefore, it really does calculate two dumping margins, and the only place that a dumping margin on entries is determined is when the Commerce Department says, okay, for this importer, the dumping margin will be X percent of entered value, and for this importer, it will be that Y percent of value. We agree that in theory, that calculation is supposed to be congruent with the way in which the overall margin was calculated, and as Mr. Tosini states, and we agree- But they don't describe it as a dumping margin on the importer. Well- They get at it through the assessment rate. Yes, but the assessment rate is what's the amount of dumping duties to be collected, and as Mr. Dorn pointed out, the duties to be collected are supposed to be what the dumping margin is. So the only way to find out what's the dumping margin on these entries is to take that assessment rate, multiply it by, you know, whatever percent of the entered value, and that's your dumping margin on entries, and that's why the Commerce Department has this assessment rate calculation, and it's why it is a significant part of the determination, why it's disclosed to all parties. Thank you very much. Thank you. Your time has expired. Thank you very much.